# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 08-CV-4526 (JFB)(AKT)

————————————

## KENNETH C. VARRICCHIO, SR.,

Plaintiff,

VERSUS

## COUNTY OF NASSAU, NASSAU COUNTY SHERIFF'S DEPARTMENT, NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE, THOMAS AMATO & DESIREE LASTER,

Defendants.

————————————

**MEMORANDUM AND ORDER**
March 17, 2010

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Kenneth Varricchio (hereinafter "plaintiff" or "Varricchio") brings this action against the County of Nassau (hereinafter "County"), the Nassau County Sheriff's Department, the Nassau County District Attorney's Office, Thomas Amato, and Desiree Laster, alleging denial of the right to a speedy trial, malicious prosecution, cruel and unusual punishment, municipal liability, conspiracy under 42 U.S.C. § 1983, and various state law tort claims, all arising from the allegedly unlawful confinement of Varricchio. Plaintiff Varricchio also filed a request that the Court grant him visitation rights to see his children, and has filed a motion to "change venue," to remove his pending state court criminal proceeding to this Court.

Defendants County of Nassau, Nassau County Sheriff's Department, Nassau County

District Attorney's Office, and Desiree Laster now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, defendants' motion to dismiss is granted in part and denied in part. Specifically, defendants' motion to dismiss plaintiff's state law tort claims and request for visitation rights with his children is granted, but defendants' motion to dismiss plaintiff's remaining claims is denied. The Court also denies plaintiff's request to remove his criminal court proceeding to federal court.

## I. BACKGROUND

### A. The Complaint

For purposes of this motion to dismiss, the Court has taken the facts described below from the plaintiff's complaint ("Compl."). These facts are not findings of fact by the Court but rather are assumed to be true for the purpose of

deciding this motion and are construed in a light most favorable to plaintiff, the non-moving party. *See LaFaro v. N.Y. Cardiothoracic Group*, 570 F.3d 471, 475 (2d Cir. 2009).

Plaintiff alleges that he was unlawfully imprisoned in Nassau County jail for over two years. (Compl. at 4.)[1]  In January 2004, plaintiff's wife obtained a protective order against plaintiff and had him evicted from their home. (*Id.*)  Despite their separation, according to plaintiff, by April 2004, he was allowed to have unsupervised visitation with his children. (*Id.*)  On April 18, 2004, plaintiff alleges that it was agreed that he could deliver groceries to his children; however, when he dropped off the groceries, his wife called the police, stating that he was not allowed to be there. (*Id.*)  Two days later, plaintiff claims he was arrested for dropping off the groceries in violation of the protective order, charged with contempt for a class "A" misdemeanor, and placed in Nassau County jail. (*Id.*)

At that point, plaintiff alleges that he demanded a speedy trial by jury. (*Id.*)  He was arraigned and was supposed to be represented by an attorney from Legal Aid; however, when he contacted Legal Aid after six months of imprisonment, he was told that there would not be a trial because he had already plead guilty to the charges. (*Id.*)  Plaintiff alleges that he never pled guilty to the charges.  Plaintiff claims that he was able to retain an attorney whom he met in the holding cells at First District Court in Hempstead, NY, John J. Budnick, whom he retained to represent him. (*Id.* at 5.)

Plaintiff claims that, on December 17, 2005, the Assistant District Attorney ("ADA") handling his case, Desiree Laster, submitted a false affirmation stating that he had already pled guilty to the two charges against him in front of Judge Norman St. George; however, she claimed that the court reporter was not in the courtroom at the time of the guilty plea. (*Id.*)  Laster's affirmation also stated that there had been a change of attorney hearing, at which Legal Aid was relieved and attorney Tim Aldrige was appointed to represent Varricchio. (*Id.*)  Varricchio contends that he knew Aldrige personally and was able to obtain an affidavit from Aldrige stating that he had never been appointed to represent Varricchio.

Varricchio makes several claims regarding his treatment during the course of his unlawful incarceration. (*Id.*)  First, plaintiff claims that he was improperly medicated on two occasions.  The first instance occurred in April 2004.  Plaintiff alleges that he is a diabetic but was given a "beta blocker," which lowered his heart rate. (*Id.*)  He allegedly asked to be brought to the hospital but did not receive assistance until several days later, when he was brought to medical. (*Id.*)  The medical staff allegedly told Varricchio that his heart rate was only 40 to 43 beats per minute, but he was sent back to his cell. (*Id.*)  He claims that two days later he was found lying face down in his cell in a puddle of his own urine, with a heart rate of 15 beats per minute—effectively, he was in a coma. (*Id.*)  He was taken by ambulance to Nassau University Medical Center where he was treated. (*Id.*)  Plaintiff claims that he was told by an emergency room doctor that he has permanent brain injury from the lack of oxygen flow to his brain as a result of receiving the "beta blocker." (*Id.* at 6.)

Plaintiff alleges that he was also improperly medicated in December 2004:

---

[1] Because plaintiff's complaint lacks page or paragraph numbers, the Court bases the page numbers of the complaint on the page numbering upon filing of the complaint with the Court, as found at docket entry [1].

specifically, he was given two-hundred milligrams of Benadryl a day for three months. (*Id.*) He claims that he requested the labeling for the Benadryl but did not receive it. (*Id.*) The Benadryl dosage raised plaintiff's heart rate and caused him chest pains and trouble breathing. (*Id.*) This resulted in plaintiff being taken back to Nassau University Medical Center again for treatment, where he claims his heart rate was over 125 beats per minute. (*Id.*)

Plaintiff thereafter filed a notice of claim with the County Attorney and the New York Supreme Court for being improperly medicated. (*Id.*) Plaintiff claims that, as a result of filing this claim, he was placed in maximum security lockup with several members of the Bloods Gang. (*Id.*) After being placed in maximum security lockup, plaintiff began to have chest pains and requested that he be removed from maximum security because he felt his safety was endangered by being there. (*Id.*) He claims that he was removed from maximum security and, instead, placed in solitary confinement for the next sixteen months. (*Id.* at 7.) Plaintiff claims he wrote a letter to Denis Dillon, the then-Nassau County District Attorney, regarding this confinement, and was interviewed by Internal Affairs at the Sheriff's Department. (*Id.*) While he was in solitary confinement, plaintiff alleges that both his sister Cynthia and his brother Steve passed away, and he was unable to attend their wakes or funerals as a result of his imprisonment. (*Id.*)

Plaintiff then appeared before Judge Susan T. Kluwer, who ordered a "730.30 exam,"[2] a psychological test to determine whether a defendant is fit to stand trial. (*Id.*) Plaintiff's complaint claims that the 730.30 exam is the "government's safety valve." (*Id.*) Plaintiff wrote an affidavit refusing to take the 730.30 exam. He claims that, nonetheless, Judge Kluwer ordered the 730.30 exam on him four times. (*Id.* at 8.) Plaintiff alleges that because he refused to submit to the exam, three sheriffs did a "shake down" of his cell and removed pictures of his children and his legal documents and supplies. (*Id.*) He was also informed that he would no longer be allowed to use certified mail to mail his legal documents. (*Id.* at 9.)

Plaintiff also contends that his meals were contaminated. Specifically, he claims that he found bodily waste, soap, and metal pins in his food. (*Id.*) He claims that two x-rays revealed metal objects in his stomach that had been mixed in with his food and that he had accidentally ingested. (*Id.*) Plaintiff thereafter began a hunger strike to protest his legal situation and because he was worried about finding more hazardous items in his food. (*Id.*) After plaintiff had gone ten days without eating, the sheriffs took plaintiff to Nassau University Medical Center Prison Ward for treatment. (*Id.*)

While at the prison ward, a Patient Care Assistant attempted to draw blood from Varricchio. While the assistant was attempting to draw Varricchio's blood, Varricchio got into a verbal altercation with Sheriff Thomas Amato. (*Id.*) Amato yelled at Varricchio to "sit down so they can take your blood!" but Varricchio refused to sit down because Amato

---

[2] Under New York Criminal Procedure Law § 730.30(1), "[a]t any time after a defendant is arraigned upon an accusatory instrument other than a felony complaint and before the imposition of sentence, or at any time after a defendant is arraigned upon a felony complaint and before he is held for the action of the grand jury, the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person."

would not turn on the light so that the Patient Care Assistant could see properly. (*Id.* at 10.) Plaintiff alleges that Amato grabbed him, threw him over a chair, and then "body slammed" him onto the floor. (*Id.*) Amato then grabbed plaintiff by his left arm "all the while twisting [plaintiff's] arm and digging his finger nails into [plaintiff's] arm." (*Id.*) At that point, other sheriffs came down the hall to break up the fight, and Varricchio was returned to his cell. (*Id.*) Nassau County's Sheriff's Department's Internal Affairs bureau interviewed plaintiff about the alleged attack. (*Id.*)

On August 3, 2006, while plaintiff was leaving his cell, Sheriff Amato allegedly instructed plaintiff to stand against the wall and face the wall, and then "body slammed" plaintiff into a steel door, cutting open plaintiff's left arm and elbow. (*Id.*) Internal Affairs again interviewed plaintiff about the altercation. (*Id.*)

In September 2006, plaintiff alleges that he ran into his friend Tim Aldrige, an attorney, at the holding cells at the First District Court. (*Id.* at 11.) Upon learning that Varricchio was still being held in prison, Aldrige posted $10,000 bail for Varricchio on September 19, 2006. (*Id.*) After he was released, the 730.30 exam was performed on plaintiff in the presence of his attorney and a court stenographer. (*Id.*) He was found competent to stand trial. (*Id.*)

While out of jail, on October 12, 2006, plaintiff claims that he ran into his former neighbor, and told her that he did not know where his wife and children live any more. (*Id.* at 12.) As a result of this interaction, plaintiff was arrested for contempt of the protective order that his former wife had against him. (*Id.*) Plaintiff was held on $50,000 bail. (*Id.*) However, because plaintiff had encountered

too many problems while he was incarcerated at the Nassau County jail, he was taken to Riker's Island. (*Id.*) Plaintiff was held at Riker's Island from October 12, 2006 until December 12, 2006, when Judge Kluwer dropped the bail against him. These charges against plaintiff were dismissed in April 2007. (*Id.* at 13.)

In January 2007, plaintiff was arrested and charged with a felony—possession of a forged instrument. (*Id.*) Plaintiff claims that the alleged forged instrument was his own income tax check, and that he was released at arraignment; this charge is no longer pending against him. (*Id.*)

In April 2007, plaintiff went to trial for the original charge of contempt from April 2004. (*Id.* at 14.) Plaintiff was found not guilty by a jury verdict. (*Id.* at 22.)

## B. The Instant Action

Plaintiff filed the instant complaint on November 7, 2008, seeking relief for constitutional violations occurring during his prosecution and incarceration from 2004 through 2007. Plaintiff alleges several causes of action relating to his unlawful incarceration at the Nassau County Correctional Center, prior to receiving a trial for a misdemeanor offense, for seven-hundred and ninety days and at Riker's Island for sixty days. (*Id.* at 16.) Plaintiff first alleges that this incarceration violated his right to a speedy trial. (*Id.* at 23.) In connection with this claim, plaintiff further contends that Judge Susan Kluwer unlawfully ordered a 730.30 psychological exam on him in an "illegal and desperate ploy to fraudulently find the plaintiff incomp[e]tent to stand trial."[3] (*Id.* at 16.) Plaintiff alleges that "[t]his illegal

---

[3] Varricchio does not name Judge Kluwer as a defendant in this action.

practice has been Nassau County's so called 'safety valve.'" (*Id.*)

Plaintiff also brings claims against the County and ADA Laster for malicious prosecution, including a claim for intentionally submitting a fraudulent affirmation to the Court on December 17, 2005, in connection with his prosecution. (*Id.* at 16, 20)

Plaintiff further brings claims for cruel and unusual punishment under Section 1983 for the use of excessive force by Sheriff Amato and exposure to cruel and unusual conditions of confinement—namely, he was given tainted food while incarcerated and was improperly medicated, resulting in several medical problems and trips to the hospital during his confinement. (*Id.* at 17-18.) Plaintiff further alleges deliberate indifference to his medical ailments, and asserts that all medication given to inmates at the Nassau County Correctional Center should have proper labeling on it to avoid such problems in the future. (*Id.* at 18.)

Plaintiff next alleges a conspiracy of attempted murder and/or assault upon him by improperly medicating him and placing him in a "gang" tier with the Bloods while he was incarcerated. (*Id.* at 17.) Plaintiff also alleges several state law claims of battery associated with the physical altercations he had with Sheriff Amato, which plaintiff contends caused plaintiff severe bodily injuries, and the improper administration of medication to him on two occasions during his confinement.

Lastly, plaintiff brings a claim requesting this Court to order that he receive visitation rights, and thereby override the ruling of the New York State Family Court on this issue. (*Id.* at 22.) He has also filed a motion to change venue, to remove his pending state criminal proceeding to federal court.

## C. Procedural History

On November 7, 2008, plaintiff filed the instant complaint against defendants. The Court granted plaintiff leave to proceed *in forma pauperis* on January 27, 2009. By letter dated April 16, 2009, defendants County of Nassau, Nassau County Sheriff's Department, Nassau County District Attorney's Office, and Desiree Laster indicated their intention to move for dismissal of the complaint for failure to state a cause of action upon which relief can be predicated. On May 28, 2009, defendants filed their motion to dismiss. Plaintiff filed opposition papers on June 25, 2009. Defendants filed their reply on July 14, 2009. Plaintiff also filed papers styled as a "motion to change venue" on July 23, 2009. Defendants filed their opposition to this motion on August 6, 2009. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), setting forth a two-pronged approach for courts deciding a motion to dismiss. District courts are to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

### III. DISCUSSION

### A. Proper Defendants

Plaintiff alleges several causes of action against the Nassau County Sheriff's Department and the Nassau County District Attorney's Office as defendants. However, "under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *See Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (dismissing claim against Lynbrook Police Department); *see also Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Because plaintiff has named the City of White Plains as a defendant, any

claims against the [White Plains Department of Public Safety] are redundant. WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("[M]unicipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them."); *Wilson v. City of N.Y.*, 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued independently because it is an agency of the City of New York." (citations omitted)). Plaintiff's allegations against the Sheriff's Department are more properly raised in claims against Nassau County. Accordingly, the Nassau County Police Department is dismissed as a defendant. For the same reason, plaintiff cannot bring claims against the Nassau County District Attorney's Office. *See Conte v. County of Nassau*, No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *1 n.2 (E.D.N.Y. Mar. 31, 2008) (dismissing Section 1983 claims against the Nassau County District Attorney's Office because the entity is an "'administrative arm[ ]' of the same municipal entity-the County . . . and thus lack[s] the capacity to be sued" (citation omitted)). Plaintiff's allegations against the District Attorney's Office are also more properly brought as claims against Nassau County.

The Court further notes that, in plaintiff's opposition papers, he appears to attempt to add new defendants to the action. The proper procedure by which to join defendants to an action is by filing an amended complaint; accordingly, in this opinion, the Court only addresses plaintiff's claims against the captioned defendants who have been properly served. *See, e.g.*, *Walton v. Waldron*, 886 F. Supp. 981, 985 (N.D.N.Y. 1995) ("Plaintiff is further permitted to amend his complaint by adding the parties he names as additional

defendants.").

## B. Plaintiff's Claims Under Section 1983[4]

Plaintiff brings several claims under Section 1983 against the County and its officers. To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983.[5] "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Plaintiff brings claims under § 1983 for (1) denial of his right to a speedy trial; (2) malicious prosecution; (3) cruel and unusual punishment; and (4) municipal liability. The Court addresses each of these arguments in turn. Here, for purposes of this motion, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether plaintiff has adequately pled a plausible claim that defendants' conduct deprived plaintiff of the

---

[4] While plaintiff's conspiracy claims are also brought under Section 1983, the Court considers these in a separate section, *infra*.

[5] Specifically, Section 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

rights he asserts.

### 1. Speedy Trial

Plaintiff first argues that his two-year detention without being tried for the contempt charges for which he was arrested in April 2004 violated his constitutional right to a speedy trial. The right to a speedy trial is also guaranteed by the Sixth Amendment. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). This right is fundamental and is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Wallace v. McDonald*, 369 F. Supp. 180, 184 (E.D.N.Y. 1973) ("The right to a speedy trial, guaranteed by the Sixth Amendment, is a federal right applicable to the states."). To successfully allege a constitutional violation, plaintiff must allege that he was denied his right to a speedy trial and that he was presumptively prejudiced by the delay. *See Doggett v. United States*, 505 U.S. 647, 651-52 (1992); *Gorman v. Goord*, Nos. 02-CV-5489(JBW), 03-MISC-0066(JBW), 2003 WL 22964468, at *7 (E.D.N.Y. Oct. 8, 2003); *see also Jackson v. Marshall*, No. 04 Civ. 3915(WHP), 2008 WL 800745, at *4 (S.D.N.Y. Mar. 25, 2008). A delay of many months is sufficient to establish presumptive prejudice. *See, e.g.*, *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) (noting "a general consensus that a delay of over eight months meets this standard"). Here, plaintiff has alleged that he was denied the right to a speedy trial on a misdemeanor charge, for which the length of pretrial detention under speedy trial statutes in New York state is generally ninety days or less. Plaintiff alleges that he was held for two years in prison prior to receiving a trial for the charge. Plaintiff further alleges that he was found not guilty of the charge and thus was severely prejudiced because he was forced to spend two years in prison for a crime of which

he was not guilty. Based on the facts alleged in the complaint and construing the facts in a light most favorable to plaintiff, the Court finds that plaintiff has adequately stated a claim regarding his denial of the right to a speedy trial.

### 2. Malicious Prosecution

Plaintiff's complaint alleges that he was prosecuted and unlawfully imprisoned in a Nassau County jail for over two years for an offense of which he was found not guilty. The defendants argue that plaintiff has not adequately stated a claim for malicious prosecution in his complaint. For the reasons set forth below, the Court disagrees and finds that plaintiff has adequately alleged a claim for malicious prosecution.

"Claims for . . . malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for . . . malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir.1984)). "'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of N.Y.*, No. 04-CV-1243, 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005) (quoting *Conway*, 750 F.2d at 214). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [the defendants'] actions.'" *Blake v. Race*, 487 F. Supp. 2d 187, 211

(E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136 (internal quotation marks omitted). In the instant case, only the final two elements are in dispute.

In a malicious prosecution action, "the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). This determination is distinct from the question of whether there was probable cause for the arrest, though a lack of probable cause to believe the plaintiff committed the crime in question necessarily entails a lack of probable cause to commence a proceeding against him. *Id.*

First, the Court is unable to determine at this juncture, as a matter of law, that there was probable cause to prosecute Varricchio. The Court lacks adequate information regarding the circumstances surrounding the decision to prosecute Varricchio. The complaint alleges that he and his wife were separated, but he had visitation rights to see his children. (Compl. at 4.) Specifically, Varricchio alleges that as of March 4, 2004, he had the right to unsupervised visitation with his children. He claims that, although his wife had a "stay away order" against him, he was able to see his children on non-visitation days in April 2004. (*Id.*) He further alleges that on April 18, 2004, it was agreed upon that plaintiff would deliver groceries to his children; however, after he dropped off the groceries, his wife called the police, stating that he was not supposed to be there. (*Id.*) Two days later plaintiff was arrested for violating the stay away order and was charged with a class A misdemeanor. (*Id.*) Construing the facts in a light most favorable to plaintiff, as the Court is required to do on a motion to dismiss, if plaintiff indeed had

permission to deliver groceries to his children on April 18, 2004, there is a question of fact regarding whether there was probable cause to prosecute plaintiff for making this delivery. Plaintiff also alleges that he was "charged with making numerous phone calls to [his] wife which [he] never made." (*Id.*) Accordingly, the Court concludes that it is not possible to determine whether there was probable cause to prosecute plaintiff at this stage of the proceedings. *See, e.g.*, *Posr*, 180 F.3d at 417.

The Court reaches the same conclusion regarding Varricchio's second arrest and prosecution, beginning in October 2006. According to the complaint, plaintiff ran into his former neighbor and stated to her that he did not know "where [his] wife and children live anymore." (*Id.* at 12.) Plaintiff alleges that his former neighbor told him "I don't know where they live either, but my son still sees your son in school." (*Id.*) As a result of this exchange, plaintiff was arrested for "indirect contact" with his wife. Plaintiff was held for two months on this charge, until Judge Kluwer released plaintiff without requiring that he post bail. The charge was dismissed in April 2007. (*Id.* at 12-13.)

Second, because the Court is unable to determine at this juncture whether Varricchio's prosecutions were based on probable cause, the Court is also unable to determine whether defendants acted with actual malice in either instance. "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Conkey v. State*, 427 N.Y.S.2d 330, 332 (App. Div. 1980)); *see also Cunningham v. N.Y. City*, No. 04 Civ. 10232, 2007 U.S. Dist. LEXIS 69801, at *15-16 (S.D.N.Y. Sept. 18, 2007) (same); *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (App. Div. 2003) ("[T]he jury was able to infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding." (citation and internal quotation omitted)). Here, because the existence of probable cause remains in question, the existence of actual malice does as well. Accordingly, the Court determines that, at this stage, plaintiff has adequately alleged a claim for malicious prosecution.

### 3. Cruel and Unusual Punishment

Plaintiff alleges three separate claims for violation of his Eighth Amendment right to be free from cruel and unusual punishment. First, plaintiff claims that he was assaulted and subjected to excessive force by Sheriff Amato. Second, plaintiff's complaint may be construed as alleging a separate claim of cruel and unusual punishment based on the conditions of his confinement, including the contaminated meals that he was served. Finally, plaintiff alleges that he was improperly medicated and denied appropriate medical attention to treat his injuries. The Court concludes that plaintiff has adequately stated a claim for cruel and unusual punishment regarding each of these claims.

#### a. Excessive Force

Plaintiff first claims that he was assaulted on two separate occasions by Sheriff Amato. Plaintiff alleges that both attacks were unprovoked and left him in serious pain. The Court concludes that plaintiff's allegations state a claim for cruel and unusual punishment under Section 1983.

Analysis of a claim for use of excessive force begins by identifying "the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel

and unusual punishments. The validity of the prisoner's claim must 'be judged by reference to th[is] specific constitutional standard . . . , rather than to some generalized 'excessive force' standard.'" *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Graham*, 490 U.S. at 394).

In *Hudson v. McMillian*, 503 U.S. 1, 4 (1992), the U.S. Supreme Court held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation omitted). Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Id.* at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *Wright*, 554 F.3d at 268 (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)); *see Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("Under the objective standard, conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. Second, the prison official involved must have a sufficiently culpable state of mind." (internal quotations and citations omitted)); *accord Lewis v. Fischer*, No. 08-CV-3027 (JG)(LB), 2009 WL 689803, at *4-6 (E.D.N.Y. Mar. 12, 2009). The subjective component requires that the plaintiff demonstrate the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. *Blyden*, 186 F.3d at 262 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 7).

The objective component of such a claim focuses on the harm done, in light of "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (quotation omitted). This component requires the Court to examine whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id.* (quoting *Wilson*, 501 U.S. at 298). If officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated." *Wright*, 554 F.3d at 269 (quoting *Hudson*, 503 U.S. at 9).

"Accordingly, where a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, [the Second Circuit] has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak." *Id.* (collecting cases); *see Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary judgment, noting that although a prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, and the "medical records after the . . . incident with [that officer] indicated only a slight injury," a triable issue of fact still existed); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) (vacating district court's *sua*

*sponte* dismissal of prisoner's complaint, though characterizing his "excessive force claim [a]s weak and his evidence [as] extremely thin" where prisoner alleged that he was hit by prison guards "after he was handcuffed" but "the only injuries he suffered were a bruised shin and swelling over his left knee").

Here, plaintiff alleges that during a medical examination, Sheriff Amato "grabbed [him,] and threw [him] over a chair. [Plaintiff] landed on the floor [and] got up to try [to] get away when Sheriff Amato grabbed [him] and body slammed [him] onto the floor. [Sheriff Amato] grabbed [plaintiff] by [his] left arm all the while twisting [plaintiff's] arm and digging his finger nails into [plaintiff's] arm." (Compl. at 10.) Plaintiff alleges that he suffered four or five cuts and bleeding a result of this attack, which left him in "agony." (*Id.*) Plaintiff further alleges that on August 3, 2006, while plaintiff was leaving his cell, Sheriff Amato instructed plaintiff to stand against the wall, then "body slammed" plaintiff into a steel door, cutting open plaintiff's left arm and elbow. (*Id.*)

At the motion to dismiss stage, plaintiff's allegations are sufficiently pled to satisfy both the subjective and objective components of a cruel and unusual punishment claim. Plaintiff's allegations suggest that Sheriff Amato attacked plaintiff without provocation on two different occasions. Plaintiff has further alleged that the attacks left him in severe pain and with physical injuries. The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The facts as alleged by plaintiff regarding the two physical altercations with Sheriff Amato sufficiently allege punishments involving the "unnecessary

and wanton infliction of pain." Moreover, under the facts as alleged, at this juncture it cannot be said that Sheriff Amato applied the alleged force to plaintiff "in a good-faith effort to maintain or restore discipline." *Wright*, 554 F.3d at 268. Instead, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence' to meet the subjective element of an Eighth Amendment claim." *Lewis*, 2009 WL 689803, at *6 (quoting *Boddie*, 105 F.3d at 861). Plaintiff has alleged that Sheriff Amato conducted unprovoked attacks on plaintiff with malice, and with the intent to cause plaintiff harm. Thus, the Court finds that plaintiff has adequately stated a Section 1983 claim for cruel and unusual punishment.

### b. Conditions of Confinement

Plaintiff also claims that he was subjected to cruel and unusual punishment because the conditions of his confinement violated contemporary standards of decency. *See Day v. Warren*, No. 08-3131-pr, 2010 WL 93150, at *1 (2d Cir. Jan. 12, 2010); *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). A prisoner alleging this type of claim "may prevail only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps*, 308 F.3d at 185 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The objective requirement "'does not mandate comfortable prisons,' [but] prisoners may not be denied 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)). Thus, the Eighth Amendment requires prisoners receive their "basic human

needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation and internal quotation marks omitted). Prison officials also may not "pose an unreasonable risk of serious damage to [prisoners'] future health." *Id.* at 35. Regarding the subjective requirement, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Phelps*, 308 F.3d at 185-86 (quoting *Farmer*, 511 U.S. at 837).

Here, plaintiff's complaint alleges sufficient facts to plead a claim of cruel and unusual punishment due to conditions of confinement. Plaintiff alleges that he received "tainted" food that contained bodily waste, soap, metal pins, and staples. (*See* Compl. at 9.) Plaintiff alleges that two metal objects were found in his stomach; this resulted in blood in his stool and unbearable pain. He claims that he was taken to the medical department and later to the hospital for x-rays but was not treated for his problems. (*Id.*) He further alleges that he began a hunger strike to protest his legal situation and because he was afraid to eat the tainted food. (*Id.*)

Plaintiff has also alleged sufficient facts to satisfy the subjective prong of his claim. When plaintiff went on a hunger strike, he alleges that the sheriffs "were taking bets on when [he] would start eating again." (*Id.*) This allegation suggests that the sheriffs were aware of the circumstances, which allegedly presented a substantial risk of serious harm to plaintiff, but did nothing about them. The complaint further suggests that plaintiff's contaminated meals may have been retaliation against him for filing a notice of claim that he was improperly

medicated on two occasions. (*See id.* at 6-9.) Plaintiff also alleges that he was placed in solitary confinement for sixteen months as a result of complaining about being improperly medicated and complaining regarding his placement in a maximum security tier. (*Id.* at 6-7.)

Courts in the Second Circuit have recognized that "depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Quintana v. McCoy*, No. 9:03-CV-0924, 2006 WL 2827673, at *6 (N.D.N.Y. Sept. 29, 2006) (quotation omitted). This Court is further mindful that "incarceration in isolation under certain circumstances constitutes cruel and unusual punishment under the Eighth Amendment." *Davis v. Lindsay*, 321 F. Supp. 1134, 1137 (S.D.N.Y. 1970). Accordingly, the Court finds that plaintiff has sufficiently alleged that he was subjected to cruel and unusual punishment based on the conditions of his confinement. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is equally plain, however, that the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."); *Phelps*, 308 F.3d at 187 ("Phelps might prove that the restricted diet was nutritionally inadequate and that placing him on such a diet for fourteen days was likely to cause serious harm, wantonly inflicting pain and suffering without penological justification and violating contemporary standards of decency."); *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam) (concluding that the Eighth Amendment requires prisoners to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it" (quotation omitted)); *Wright v. McMann*, 387 F.2d 519, 525-26 (2d Cir. 1967) (concluding that allegations by prisoner that he was placed in a solitary confinement cell for thirty-three

days, that he was deprived of basic elements of hygiene such as soap and toilet paper, and that cell was filthy, unheated, and virtually barren would, if established, constitute cruel and unusual punishment); *Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (denying summary judgment based upon allegations that "corrections officer . . . denied [plaintiff] food on six occasions and on at least two occasions contaminated his food with spit or perfume); *Chapdelaine v. Keller*, No. 95-CV-1126 RSP/GLS, 1998 WL 357350, at *12 (N.D.N.Y. Apr. 16, 1998) ("[W]hen establishing that the food served by a prison violates the Eighth Amendment, an inmate must show that the food was either nutritionally inadequate or prepared, and served in a fashion that presents an immediate danger to the inmate's health or well-being." (citation omitted)).

c. Inappropriate Medical Care

Finally, plaintiff contends that he was improperly medicated on two occasions, in April 2004 and December 2004. Plaintiff alleges that he was improperly administered medications that resulted in his heart rate slowing down to as low as 15 beats per minute, and speeding up to a rate of over 125 beats per minute. The Court concludes that plaintiff has stated a claim for cruel and unusual punishment due to medical indifference with regard to the failure to treat him for the first incident and regarding the alleged administration of improper medication on those two occasions.

A plaintiff may allege cruel and unusual punishment by pleading facts that suggest that the defendants knew of and disregarded an excessive risk to his health. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003)

("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). "'In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs.'" *Veloz v. New York*, 178 F. App'x 39, 41 (2d Cir. 2006) (quoting *Smith*, 316 F.3d at 183). Nonetheless, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d at 703. "'[T]he alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists,' and subjectively, 'the charged official must act with a sufficiently culpable state of mind,' which is more than mere negligence and akin to criminal recklessness." *Day*, No. 09-1520-pr, 2010 WL 95125, at *1 (2d Cir. Jan. 12, 2010) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). The official "must be subjectively aware that his conduct creates a substantial risk of harm to the inmate, but he or she must consciously disregard that risk." *Id.* (internal citation and quotation marks omitted).

Plaintiff points to several incidents to support his claim of cruel and unusual punishment for improper medical treatment. In the first instance, plaintiff alleges that he was given a "beta blocker," which lowered his heart rate. (Compl. at 5.) Plaintiff alleges that he requested to be brought to the hospital but it was not until several days later that he was brought to medical. (*Id.*) The complaint claims that when he was examined in medical, plaintiff was informed that his heart rate was only 40 to 43 beats per minute, but he

nonetheless returned to his cell. (*Id.*) Two days later, plaintiff was allegedly found lying face down in his cell with a heart rate of 15 beats per minute. (*Id.*) At that point, plaintiff alleges that he was taken to the hospital, where he was told by an emergency room doctor that he had suffered permanent brain injury from the lack of oxygen flow to his brain as a result of receiving the "beta blocker." (*Id.* at 6.) Plaintiff alleges a second instance of being improperly medicated in December 2004. Plaintiff claims that he was administered two-hundred milligrams of Benadryl a day for three months; this raised plaintiff's heart rate and caused him chest pains and trouble breathing. (*Id.*) Plaintiff was brought back to the hospital, where he was told that his heart rate was over 125 beats per minute. (*Id.*)

The Court determines that plaintiff has stated a claim regarding improper medical treatment. Specifically, the facts alleged by plaintiff suggest that he was examined by medical officials at the prison and told that his heart rate was only 40 to 43 beats per minute but was not treated for this. Instead, plaintiff alleges that he was returned to his cell, where he was eventually found in a coma. The Court thus finds that plaintiff has alleged facts suggesting that he received inadequate medical treatment and that prison officials may have been aware that their conduct created a substantial risk of harm to Varricchio, which they disregarded. Denying or delaying access to medical care may constitute deliberate indifference. *See Abdul-Jabbar v. West*, No. 05-CV-0373F, 2009 WL 2762270, at *6 (W.D.N.Y. Aug. 26, 2009) (citing *Estelle*, 429 U.S. at 104). "The Second Circuit has identified several non-exclusive factors relevant to the 'sufficiently serious' inquiry: '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Maccharulo*

*v. Gould*, 643 F. Supp. 2d 587, 599 (S.D.N.Y. 2009) (quoting *Chance*, 143 F.3d at 702). Plaintiff has alleged sufficient facts suggesting that he was suffering from medical problems that could have resulted in death or, at least, extreme pain. *See Abdul-Jabbar*, 2009 WL 2762270, at *6. Specifically, plaintiff has alleged that he had a low heart rate when he was examined by prison medical officials, but they sent him back to his cell. He was later allegedly found in a coma in his cell.

The Court also determines that plaintiff has sufficiently pled that he was subjected to cruel and unusual punishment when he was administered the "beta blocker" and Benadryl. Specifically, plaintiff contends that the County's policy of not properly labeling medications resulted in plaintiff being administered a "beta blocker" even though he was a diabetic. He also alleges that he was medicated with two-hundred milligrams of Benadryl a day for three months—an amount, that plaintiff alleges, was very dangerous to his health. Plaintiff's allegations of these two instances, in connection with his claim that the County had a policy that prevented the labeling of these medications—which plaintiff alleges would have prevented the harm to him from occurring—is sufficient to state a claim the County was deliberately indifferent to Varricchio's medical needs. Liberally construed, plaintiff has adequately alleged that the County should have been subjectively aware that their conduct created a substantial risk of harm to Varricchio. *See Lantz*, 2010 WL 95125, at *1.

Accordingly, as detailed above, plaintiff's complaint states a claim that he was improperly medicated on two occasions and that he was denied adequate medical treatment for his ailment resulting from being improperly medicated. Thus, these claims survive

defendants' motion to dismiss.[6]

### 4. Municipal Liability

Defendants move to dismiss the claims of municipal liability against the County of Nassau on the grounds that these claims are merely conclusory and do not make a showing of such liability with the requisite specificity. For the reasons set forth below, the Court finds that plaintiff has adequately alleged municipal liability with respect to the alleged constitutional violations and denies defendants' motion to dismiss plaintiff's claim of municipal liability.

The Supreme Court expressly rejected liability pursuant to a theory of *respondeat superior* for purposes of § 1983 in *Monell v. Department of Social Services*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of N.Y.*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). "[M]unicipal liability under § 1983 attaches where—and only where—a

deliberate choice to follow a course of action is made from among various alternatives" by the municipality's lawmakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84, (1986)). An individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). In particular, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)).[7]

---

[6] The Court also notes plaintiff's complaint alleges a third instance of failure to properly treat plaintiff's medical problems when he alleges that he was not treated when two metal objects were found in his stomach, resulting in blood in his stool and unbearable pain. Specifically, plaintiff contends that he was examined by the medical department, but was not treated for this problem. For the same reasons as the other claims, this claim also survives the motion to dismiss.

[7] In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. . . ."). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296. "In addition to establishing that a policymaker ordered a subordinate's decision, a plaintiff can show municipal liability by demonstrating that 'the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (quoting *Amnesty Am.*, 361 F.3d at 126); *Houghton v. Cardone*, 295 F. Supp.

The Court finds that plaintiff has alleged sufficient facts to make a plausible claim for municipal liability against the County. As discussed *supra*, plaintiff has adequately alleged that he was denied a speedy trial and was detained for two years before receiving a trial for a misdemeanor charge. Plaintiff alleges that Judge Kluwer attempted to order a 730.30 competency examination on him four separate times. Plaintiff contends that the government was attempting to use this examination in order to have plaintiff declared incompetent to stand trial, in order that it might prolong plaintiff's detention. Plaintiff alleges that this is the government's policy, used to unlawfully detain defendants: specifically, plaintiff alleges that "the 730-30 exam is the government's safety valve." (Compl. at 7; *see also id.* at 16.) Plaintiff also asserts that the government uses the 730.30 exam to find people incompetent to stand trial whom they have unlawfully incarcerated or denied the right to a speedy trial. (*Id.* at 7-8 ("This is how Nassau County tries to bury an unlawfully incarcerated defendant!!").) The Court finds that plaintiff's complaint, liberally construed, has adequately alleged a policy or procedure

---

2d 268, 277 (W.D.N.Y. 2003) ("Even in the absence of an explicitly adopted rule or regulation, a plaintiff may prove the existence of municipal policy if he can show that the unlawful act was done or approved by the person with final policymaking authority in the area in which the action was taken. Where, however, liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified both the subordinate's decision and the basis for it. . . .") (internal citations and quotation marks omitted)).

Here, the Court concludes that plaintiff has not alleged any facts suggesting that the allegedly unconstitutional behavior of the County's officials was done by policymakers or by subordinates acting at the direction or ratification of a policymaker.

with regard to denying prisoners the right to a speedy trial.

Plaintiff has stated a policy or procedure of malicious prosecution as well. He alleges that, on two separate occasions, he was arrested for behavior that allegedly violated the contempt order that his wife had against him; on both of these occasions, he was found not guilty of violating the order. Plaintiff also alleges that he was charged with making numerous phone calls to his wife that he never made. He alleges that these "other false charges were dismissed." (*Id.* at 4.) Plaintiff also claims that he was again prosecuted in January 2007, when he was arrested and charged with possession of a forged instrument. Plaintiff contends that because the alleged forged instrument was his own income tax check, he was released at arraignment, and the charge is no longer pending against him. Mindful that plaintiff is *pro se*, this Court construes his allegations to "raise the strongest arguments that they suggest." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 145-46 (2d Cir. 2002); *accord Maniruzzaman v. Holder*, No. 09-1776-ag, 2010 WL 565600, at *1 (2d Cir. Feb. 18, 2010). The Court concludes that, by alleging at least three instances in which he personally was allegedly maliciously prosecuted, plaintiff has adequately alleged the existence of a policy or procedure of malicious prosecution by the County. Accordingly, defendants' motion to dismiss plaintiff's claim of municipal liability on this ground is denied.

Plaintiff's claims of cruel and unusual punishment also are sufficient to allege municipal liability. Plaintiff alleges several different grounds for his claim of cruel and unusual punishment: excessive force, conditions of confinement, and inadequate medical treatment. The Court concludes that, at this stage, the complaint alleges a policy or procedure of treatment that is sufficient to state a claim for municipal liability. Plaintiff alleges that he was subjected to excessive force at the

hands of Sheriff Amato on at least two occasions. Plaintiff further alleged that Sheriff Amato assaulted other inmates as well. (Compl. at 11.) Plaintiff alleges that he received inadequate medical treatment on several different occasions during his incarceration. Plaintiff claims that he was examined by medical personnel and told that his heart rate was only 40 to 43 beats per minute and that his "blood pressure was 'crashing.'" (Compl. at 5.) Plaintiff contends that he was nonetheless returned to his cell, where he was eventually found in a coma. Plaintiff further alleges that he was placed in solitary confinement for sixteen months when he filed a notice of claim regarding the improper medical treatment that he received. He alleges that he was given tainted food with metal objects in it on several occasions. Plaintiff also alleges that he was not treated after x-rays revealed that there were medical objects in his stomach that he had mistakenly ingested. He further claims that he went on a hunger strike as a result of receiving tainted food. He alleges that this hunger strike lasted ten days and that the sheriffs were aware of his actions.

Plaintiff also argues, in connection with his claims of improper medical treatment, that there was a custom or policy regarding the County's failure to provide medication labeling to prisoners. Plaintiff alleges that he was twice given the incorrect medication as a result of improper labeling of the medicines with which he was being treated. Plaintiff further alleges that during this incident and the incident in which he was given too much Benadryl, he was refused labeling for the medications. (*Id.*) Plaintiff's complaint alleges that "[a]ll medications dispensed by prescription only and all 'over the counter' medications must come with labeling, which includes dosages, side effects, and limits as to the patient's medical history. The general public is issued labeling for medication but inmates at the Nassau County Correctional Center are not." (*Id.* at

18.) The complaint continues that "[t]he plaintiff begs the Court to change the 'dangerous' and illegal policy, and to force the County of Nassau . . . to supply and issue labeling for any and all medications prescribed and/or issued to inmates at the Nassau County Correctional Center." (*Id.*)

At this motion to dismiss stage, plaintiff's allegations are sufficient to avoid dismissal. Even after the Supreme Court's decision in *Twombly*, this Court remains "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam)). In short, given this series of allegations, in the context of the entire complaint, *pro se* plaintiff's claim of municipal liability survives defendants' motion to dismiss, and defendants' motion to dismiss this claim is denied.

C. Conspiracy Under Section 1983

Plaintiff alleges that defendants conspired to murder him by tainting the food he consumed, improperly medicating him to cause him to go into a coma, and placing him in a cell block with members of the Bloods gang. Defendants argue for dismissal of plaintiff's conspiracy claims under Section 1983 on the basis of the intracorporate conspiracy doctrine. For the reasons set forth below, the Court agrees and dismisses plaintiff's conspiracy claims on the basis of this doctrine.[8]

---

[8] Because the Court dismisses the conspiracy claims on the basis of the intra-corporate conspiracy doctrine, the Court need not address defendants' argument that these claims should be dismissed because the allegations of conspiracy are merely conclusory. *See, e.g.*, *Salgado v. City of N.Y.*, No. 00 Civ. 3667, 2001 U.S. Dist. LEXIS 3196, at *24-25 (S.D.N.Y. Mar. 26, 2001) (granting motion to dismiss Section 1983 conspiracy claim where pleading "merely states the legal standard [for the personal stake exception] without alleging specific facts giving rise to an inference that the

The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other. *See, e.g.*, *Farbstein v. Hicksville Pub. Library*, 254 F. App'x 50, 50-51 (2d Cir. 2007) (affirming dismissal of conspiracy complaint "at the first step of analysis" because complaint made reference only to employees of same corporation) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *Herrmann*, 576 F.2d at 459 ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers[ ] and employees, each acting within the scope of his employment."); *Rini v. Zwirn*, 886 F. Supp. 270, 292 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."); *accord Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003); *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 359-60 (E.D.N.Y. 1999). Here, plaintiff does not dispute that defendants are all employees of a single municipal entity—Nassau County. The Court has carefully reviewed the complaint and finds that the intracorporate conspiracy doctrine prevents a finding of liability of defendants for participation in a conspiracy to deny plaintiff his constitutional rights. Thus, the Court dismisses plaintiff's claims of conspiracy under Sections 1983.

### D. State Law Battery Claims

Plaintiff alleges several state law tort claims for battery. Defendants argue that all of plaintiff's state law battery claims against the County are barred by New York General Municipal Law § 50. New York General Municipal Law § 50-e requires service of a notice of claim as a condition precedent to the commencement of an action or special proceeding against a public (i.e., municipal) corporation, within ninety days of the event(s) giving rise to such claim. *Id.* Furthermore, "the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law § 50-i(1). These state notice-of-claim statutes apply to state law claims brought in federal court. *DeCarolis v. Town of Vienna*, 322 F. App'x 25, 26 (2d Cir. 2009) (citing *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999)).

In opposition to the defendants' motion to dismiss, plaintiff submits several papers which appear to include notices of claim that he filed regarding his battery claims. Plaintiff alleges three state law battery claims in his complaint: (1) that he was improperly medicated on two occasions, once receiving a "beta blocker" that slowed down his heart rate, and, at another time, receiving an overdose of Benadryl that resulted in his heart rate speeding up; (2) that he received tainted food on more than one occasion, including food with metal in it, that he accidentally ingested; and (3) that he was attacked by Sheriff Amato on two different occasions, resulting in physical injury to his person.

First, plaintiff brings two claims that he was improperly medicated. Varricchio claims that he was improperly medicated with a "beta blocker" in April 2004. He also alleges that he received an overdose of Benadryl in December 2004. He appears to have attempted to file a complaint in state court regarding these incidents on December 3, 2005, against Nassau County Correctional Center, Nassau University Medical Center, Nassau County Sheriff's

---

standard has been satisfied"). The Court further notes the existence of the personal stake exception to the intracorporate immunity doctrine and finds that plaintiff has pleaded no facts that warrant its application in the instant case.

Department, Doctor Manetti, and Doctor Ebenezer. (Pl.'s Opp. [26] at 43-46.)[9] Varricchio filed a notice of claim regarding this incident on August 6, 2006 (Pl.'s Opp. [26] at 29-42), but no earlier. Plaintiff next contends that his meals were contaminated in or around May 2005, with bodily waste, soap, and metal pins in his food, and that he accidentally swallowed some of the objects in his food. He filed a notice of claim regarding this on August 6, 2006. (Pl.'s Opp. [26] at 29-42.) He also filed a complaint containing a claim about this incident on March 14, 2006. (Pl.'s Opp. [28-3] at 50.) Plaintiff's third battery claim involves the alleged attacks by Sheriff Amato on plaintiff, which occurred on or about July 28, 2006 and again on August 3, 2006. Plaintiff filed a notice of claim regarding these incidents on August 6, 2006. (Pl.'s Opp. [26] at 29-42.) Plaintiff filed the instant action on November 7, 2008.

The Court notes that plaintiff filed notices of claim for the "wrongful medication" and "meal contamination" incidents well after the ninety day limit for filing notices of claim. Although where there is actual notice and an absence of prejudice, the lack of a reasonable excuse will not bar the granting of leave to serve a late notice of claim against a municipality, *Brownstein v. Incorp. Vill. of Hempstead*, 859 N.Y.S.2d 682, 686 (App. Div. 2008), a court may not entertain such request filed after the one-year and ninety-day statute of limitation period for bringing tort claims against a municipality has expired. *Porcaro v. Town of Beekman*, 790 N.Y.S.2d 58, 59 (App. Div. 2005); *Lanphere v. County of Washington*, 754 N.Y.S.2d 125, 126 (App. Div.

2003).[10] Furthermore, late service of an original notice of claim in a personal injury suit is a nullity when it is made without leave of the court. *See Pierre v. City of N.Y.*, 804 N.Y.S.2d 365, 366 (App. Div. 2005); *Small v. N.Y. City Transit Auth.*, 789 N.Y.S.2d 229, 230 (App. Div. 2005); *see also Tarquinio v. City of N.Y.*, 445 N.Y.S.2d 732, 734-35 (App. Div. 1982), *aff'd*, 439 N.E.2d 331, 333 (1982) ("In this case the time for filing a notice without court approval had expired and no application for an extension was made prior to the expiration of the Statute of Limitations. Thus the court lacked the power to authorize late filing of the notice.").

Plaintiff has not demonstrated that he filed a timely notice of claim or requested leave to file a late notice of claim for his improper medication claims. The resolution of the lawsuit that plaintiff filed in state court regarding these incidents on December 3, 2005 is unclear; however, the Court notes that the December 3, 2005 complaint was filed after the one-and-ninety-day statute of limitations on claims against the County, per General Municipal Law § 50-i(1). The instant action is also outside the one-year-and-ninety-day statute of limitations. The Court also notes that plaintiff filed a late notice of claim regarding his meal contamination claims: he filed a notice of claim regarding these incidents on August 6, 2006, although they had occurred in May 2005. As stated *supra*, late service of a notice of claim is a nullity when made without leave of the Court. Furthermore, the instant action is also outside the one-year-and-ninety-days statute of limitations on plaintiff's claim. Accordingly, the Court must dismiss plaintiff's first two causes of action for battery as pled

---

[9] Because plaintiff filed several sets of opposition papers, the Court lists the docket entry number corresponding to each set of opposition papers in brackets.

[10] The Court notes that the Court may grant leave to file a late notice of claim if the statute of limitations has been tolled; however, it finds no reason to toll the statute of limitations with respect to Varricchio's claims. *See Pierson v. City of N.Y.*, 439 N.E.2d 331, 332, 334 (1982).

against the County, for failure to file timely notices of claim.

Finally, the Court notes that although plaintiff filed a timely notice of claim regarding the alleged attacks by Sheriff Amato, plaintiff filed the instant action outside of the statute of limitations for the state law claim. Moreover, plaintiff has not alleged any facts suggesting that the statute of limitations should have been tolled. *Pierson v. City of N.Y.*, 439 N.E.2d 331, 332, 334 (1982). Accordingly, plaintiff's battery claim regarding the attacks by Amato are dismissed as alleged against the County.

Thus, the Court dismisses plaintiff's battery claims against the County. Plaintiff's claims are dismissed without leave to replead because they are barred by New York General Municipal Law § 50.

### E. Absolute Immunity

Plaintiff brings claims against ADA Laster for intentionally submitting a fraudulent affirmation to the Court on December 17, 2005, which stated that plaintiff had pleaded guilty to two charges of contempt in front of Judge Norman St. George. (*Id.* at 5, 16, 20.) Plaintiff contends that he never pleaded guilty to these charges, there was no court reporter in the room at his alleged plea, and ADA Laster never specified the date of the alleged plea. Plaintiff's complaint may also be construed as asserting a malicious prosecution claim against ADA Laster. In response to plaintiff's claims, the defendants argue that ADA Laster, as a prosecutor acting within the scope of her duty, is absolutely immune from suit for the alleged actions. The Court concludes that ADA Laster is protected by absolute immunity; accordingly, plaintiff's claims against her must fail.

"It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. . . . This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" *Deronette v. City of N.Y.*, No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at *12 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and quoting *Imbler*, 424 U.S. at 419 n.13). However, the Second Circuit has held that, "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995).

"In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct "'intimately associated with the judicial phase of the criminal process.'" *Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (quoting *Imbler*, 424 U.S. at 430); *accord Hill*, 45 F.3d at 661. In particular, "[s]uch immunity . . . extends to acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Smith v. Bodak*, 147 F.3d 91, 94 (2d Cir. 1998) (citation and quotation marks omitted). On the

other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661; *see also Carbajal v. County of Nassau*, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability.").

Once a court determines that a prosecutor was acting as an advocate, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli*, 424 F.3d at 237 (quoting *Bernard*, 356 F.3d at 502); *see also Kleinman v. Multnomah County*, No. 03-1723-KI, 2004 U.S. Dist. LEXIS 21466, at *18 (D. Or. Oct. 15, 2004) ("The Ninth Circuit has interpreted *Imbler* to support absolute prosecutorial immunity even when a plaintiff alleges that the prosecutor went forward with a prosecution he believed not to be supported by probable cause.").

Plaintiff claims that ADA Laster maliciously prosecuted plaintiff. Plaintiff contends that this malicious prosecution included the filing of a false affirmation with the Court, stating that plaintiff pleaded guilty to two charges of contempt in front of Judge Norman St. George. Plaintiff alleges that ADA Laster claimed that "when the guilty plea was taken the court reporter was not in the court room" and did not specify the date of the alleged plea. It is well settled that prosecutors are immune from Section 1983 malicious prosecution actions, *see Imbler*, 424 U.S. at 427-28, and are entitled to absolute immunity

when, in the course of a prosecution, they present false evidence to the Court or exert influence over a defendant's guilty plea. *See Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006) ("Plaintiff's claims against [his prosecutor], which encompass activities involving the initiation and pursuit of prosecution [including fabricating evidence used at trial, withholding exculpatory evidence, suborning perjury, and attempting to intimidate him into accepting a guilty plea], are foreclosed by absolute prosecutorial immunity, regardless of their alleged illegality."); *Urrego v. United States*, No. 00 CV 1203, 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (finding that a prosecutor is entitled to absolute immunity where he was alleged to have presented false evidence in order to obtain a superceding indictment) (citing *Buckley*, 509 U.S. at 260; *Hill*, 45 F.3d at 662; *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2003)); *see also Storck v. Suffolk County Dep't of Social Servs.*, 62 F. Supp. 2d 927, 943 (E.D.N.Y. 1999) ("A prosecutor is also absolutely immune from charges alleging the withholding of exculpatory evidence from a grand jury and suppressing *Brady* material. An allegation of conspiracy to perform the foregoing acts does not change the conclusion that the acts are entitled to absolute immunity." (citations omitted)). "[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include . . . allegedly conspiring to present false evidence at a criminal trial." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994). In *Tellier v. Petrillo*, plaintiff alleged that the United States attorneys had "formed a conspiracy to fabricate a new charge, not contained in the original indictment" and had "conspired to present the fabricated evidence to a grand jury in order to obtain a superceding indictment." 133 F.3d 907 (2d Cir. 1997). The Second Circuit affirmed the dismissal of the complaint, noting that the presentation of a superceding

indictment was protected by absolute immunity. *Id.* Indeed, prosecutors have absolute immunity in connection with a variety of actions associated with pursuing a prosecution. *See, e.g.*, *Imbler*, 424 U.S. at 431 (absolute immunity for "initiating a prosecution"); *Barr v. Abrams*, 810 F.2d 358, 362 (2d Cir. 1987) (filing a criminal information); *Powers v. Coe*, 728 F.2d 97, 103-04 (2d Cir. 1984) (entering or breaching an agreement not to prosecute); *Taylor v. Kavanagh*, 640 F.2d 450, 451-52 (2d Cir. 1981) (negotiating a guilty plea); *see also Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) ("[A]s a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on the decision not to prosecute." (emphasis in original)).

Because the Court determines that ADA Laster, based upon the conduct alleged in regard to her wrongdoing, was performing conduct "intimately associated with the judicial phase of the criminal process," *Fielding*, 257 F. App'x at 401, the Court dismisses plaintiff's claims against ADA Desiree Laster.

## F. Visitation Rights

Plaintiff's complaint also alleges that he has been "illegally separated from [his] three minor children from the date of [his] arrest of April 20, 2004 to date." (Compl. at 22.) Plaintiff claims that while incarcerated, he was denied the right to visitation by his children at the Nassau County Correctional Center. (*Id.*) After his release, plaintiff requested that the Family Court allow him visitation with his children, but this request was denied because "the children were potential witnesses for the County of Nassau against the plaintiff." (*Id.*) Plaintiff alleges that he is still petitioning the Family Court for visitation with his children. In response, defendants argue that this Court cannot offer plaintiff relief because domestic relations is an area in which the federal courts should defer to the states. The Court agrees.

Under the domestic relations doctrine exception to federal courts' jurisdiction, "federal courts are divested of jurisdiction in 'cases involving the issuance of a divorce, alimony, or child custody decree.'" *Hamilton v. Hamilton-Grinols*, No. 08-6111-cv, 2010 WL 337287, at *1 (2d Cir. Feb. 1, 2010) (quoting *Ankenbrant v. Richards*, 504 U.S. 689, 704 (1992)). Indeed, the Supreme Court has stated that, "[a]s to the right to the control and possession of [a] child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction." *In re Burrus*, 136 U.S. 586, 594 (1890). In later decisions, the Supreme Court has affirmed its prior holding that "'[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'" *See Ankenbrant*, 504 U.S. at 703 (quoting *Burrus*, 136 U.S. at 593-94).[11]

The policy considerations underlying federal courts' abstention from the domestic relations arena are strong. As the Court explained in *Ankenbrant*:

> Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of

---

[11] Although *Ankenbrant* involved a case in federal court due to diversity jurisdiction, the domestic relations exception applies with equal force to cases arising under federal question jurisdiction. *See, e.g.*, *American Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990).

conflicts over divorce, alimony, and child custody decrees. Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees.

*Id.* at 703-04. Although the domestic relation exception is narrow, "it applies generally to issues relating to the custody of minors." *Mitchell-Angel v. Cronin*, No. 95-7937, 1996 WL 107300, at *2 (2d Cir. Mar. 8, 1996) (citing *Williams v. Lambert*, 46 F.3d 1275, 1283 (2d Cir. 1995); *Hernstadt v. Hernstadt*, 373 F.2d 316, 317 (2d Cir. 1967)).

In the present case, plaintiff's final cause of action, alleging that he has been denied the right to visit with his children, falls within the domestic relations exception to this Court's jurisdiction. Specifically, plaintiff's complaint requests that this Court overrule a decision of the Nassau County Family Court to end his separation from his children and grant him visitation rights. Plaintiff's visitation rights claim invites this Court to review and reject a state court judgment regarding child custody and visitation. Thus, plaintiff's claim for visitation rights is dismissed because it runs afoul of the jurisdictional limits of federal courts, as set by the United States Supreme Court.

IV. MOTION TO CHANGE VENUE

On July 23, 2009, plaintiff also filed with the Court a "motion for change of venue." It appears that this document is plaintiff's attempt to remove a currently pending state criminal proceeding against him to federal court. Plaintiff further requests that this Court dismiss the state criminal complaint against him for failure to grant plaintiff a speedy trial. For the

reasons set forth below, the Court denies plaintiff's request.

A criminal prosecution can be removed to a federal court only if it is commenced:

(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law.

28 U.S.C. § 1443; *see also People of the State of New York v. Ross*, 08 Civ. 10885, 2008 U.S. Dist. LEXIS 103246, at *2-3 (S.D.N.Y. Dec. 22, 2008). In interpreting § 1443, the U.S. Supreme Court has concluded that "[o]n the basis of the historical material that is available, [the phrase 'any law providing for . . . equal civil rights[,]'] must be construed to mean any law providing for specific civil rights stated in terms of racial equality." *Georgia v. Rachel*, 384 U.S. 780, 792 (1966); *State Farm Mutual Auto. Ins. Co. v. Baasch*, 644 F.2d 94, 97 (2d Cir. 1981). Furthermore, "it must appear, in accordance with the provisions of § 1443(1), that the removal petitioner is denied or cannot enforce the specified federal rights 'in the courts of [the] State.'" *Johnson v. Mississippi*, 421 U.S. 213, 219 (1975) (internal quotations omitted).

Plaintiff has not satisfied either of the two prongs required for removal under Section 1443. Plaintiff's motion claims that he was charged with one count of criminal contempt due to a criminal complaint filed by his ex-wife. (Pl.'s Mot. at 1.) The plaintiff claims that his "civil rights . . . are being violated by the County of Nassau," but does not allege a

civil rights violation "in terms of racial equality," as is required to remove a criminal action to federal court. Although the plaintiff's motion appears to assert his right to a speedy trial in the state criminal proceeding, the right to a speedy trial is not grounds to remove under § 1443. *People of the State of New York v. Konigsberg*, 305 F. Supp. 1201, 1202-03 (S.D.N.Y. 1969). Indeed, "[i]n view of the fact that the civil right to a speedy trial relied upon by [plaintiff] as the basis for removal of the criminal contempt proceedings is not couched in terms of equality, but rather is of general application available to all persons, he cannot succeed in this petition." *Id.* (citing *United States ex rel. Perkins v. Noble*, 287 F. Supp. 365, 366 (E.D.N.Y.1968)).

Moreover, plaintiff has not shown that he would be precluded from proceeding in state court. Removal is available under § 1443 "only if it can be predicted by reference to a law of general application that the [removing party] will be denied or cannot enforce the specified federal rights in the state courts." *Rachel*, 384 U.S. at 800; *accord Emigrant Savings Bank v. Elam Mgmt. Corp.*, 668 F.2d 671, 674 (2d Cir. 1982). It is insufficient for the removing party to have a mere apprehension that he will be denied or unable to enforce his rights in state court. *People v. Smith*, 08-CV-4422 (JS)(MLO), 2009 U.S. Dist. LEXIS 66497, at *6-7 (E.D.N.Y. July 31, 2009) (citing *Emigrant Savings Bank*, 668 F.2d at 673-74). In the instant case, plaintiff has not shown that he cannot litigate his rights in state court. The Court has further found no independent basis for concluding that plaintiff would be precluded from arguing that he was allegedly deprived of his federal rights in state court. In fact, in plaintiff's moving papers, it appears that he did file a motion in his state criminal proceeding around the same time as he filed this "motion to change venue." It appears that the state filed opposition papers to plaintiff's motion in state court on July 1, 2009. Plaintiff has submitted no information

or claims regarding the resolution of this motion. This Court lacks a sufficient basis from which to conclude from plaintiff's submission that plaintiff cannot argue for his right to a speedy trial in state court. Accordingly, plaintiff's motion to remove his pending state court criminal proceeding to this Court is denied.

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiff's complaint is granted in part and denied in part. Specifically, plaintiff's state law tort claims and his request that the Court grant him visitation rights to his children are dismissed. The remainder of plaintiff's claims survive defendants' motion to dismiss. The Court also denies plaintiff's motion to remove his pending state criminal prosecution to federal court. The claims against Amato, who has filed an answer, will also proceed. A copy of this Order has been mailed to *pro se* plaintiff.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 17, 2010
Central Islip, NY

\* \* \*

Plaintiff is proceeding *pro se*. Defendants County of Nassau, Nassau County Sheriff's Department, Nassau County District Attorney's Office, and Desiree Laster are represented by Matthew Brian Weinick, Office of the County Attorney, 1 West Street, Mineola, NY 11501.